John Eddie Williams Jr. (*pro hac vice pending*)
John Boundas (*pro hac vice pending*)
Brian Abramson (*pro hac vice pending*)
Margret Lecocke (*pro hac vice pending*)
Alejandro Jose Salicrup (*pro hac vice pending*)
Walt Cubberly (SBN 325163)
**WILLIAM HART & BOUNDAS, LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5051
Telephone: (713) 230-2200
Facsimile: (713) 643-6226
Email:  wcubberly@whlaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| Jane Doe F-1, an individual,<br><br>Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC., a Delaware Corporation; RAISER, LLC, a Delaware Limited Liability Company; RAISER-CA, LLC, a Delaware Limited Liability Company; and DOES 1 through 50, Inclusive,<br><br>Defendants. | Case No.:  _____<br><br>**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**<br><br>1. GENERAL NEGLIGENCE<br>2. COMMON CARRIER NEGLIGENCE<br>3. NEGLIGENT HIRING, RETENTION, AND SUPERVISION<br>4. NEGLIGENT FAILURE TO WARN<br>5. NEGLIGENT MISREPRESENTATION<br>6. INTENTIONAL MISREPRESENTATION<br>7. VICARIOUS LIABILITY/LIABILITY FOR THE TORTS OF UBER DRIVERS<br>8. VICARIOUS LIABILITY FOR SEXUAL ASSAULT<br>9. VICARIOUS LIABILITY FOR SEXUAL BATTERY<br>10. STRICT PRODUCT LIABILITY – FAILURE TO WARN |

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**INTRODUCTION**

1.      Plaintiff, by and through her attorneys of record, makes the following Complaint against Defendants Uber Technologies, Inc. ("Uber Tech"), a Delaware Corporation with its principal place of business in San Francisco, California; Raiser, LLC ("Raiser"), a Delaware Limited Liability Company with its principal place of business in San Francisco, California; Raiser-CA, LLC ("Raiser-CA")s, a limited liability company with its principal place of business in San Francisco, California, and Does 1 through 50 (collectively, "Uber"), inclusive,  alleging as follows.

**NATURE OF ACTION**

2.      Uber is a transportation company headquartered in San Francisco, California. Beginning in 2009, Uber created a transportation system that has been implemented around the world, including across the entire United States.

3.      Passengers pay Uber a fee in exchange for safe passage to their destination. Uber's public representations claim that "safety is our top priority" and "it is our goal to make every ride safe, comfortable, and reliable." But Uber's priority is not passenger safety. Profits are Uber's priority. As a result, female passengers, such as Plaintiff, continue to be attacked by sexual predators driving for Uber.

4.      As early as May 2013, Uber became aware that Uber drivers were sexually assaulting and raping female passengers. Since as early as May 2013, sexual predators driving for Uber have continued to sexually assault, harass, falsely imprison, kidnap, physically assault, and commit acts of sexual misconduct against Uber's passengers. Complaints to Uber by female passengers attacked by Uber drivers, combined with subsequent criminal investigations by law enforcement, clearly establish that Uber has been fully aware of these continuing attacks by sexual predators driving for Uber.

5.      Uber's response to this sexual predator crisis amongst Uber drivers has been appallingly inadequate. Uber continues to hire drivers without performing adequate background checks. Uber

2

continues to allow drivers who sexually assault passengers or engage in sexual misconduct directed at passengers to keep driving for Uber. And, perhaps most importantly, Uber has failed to adopt and implement reasonable procedures designed to protect the safety of its passengers. Consequently, Uber passengers continue to be the be sexually victimized by Uber drivers every hour.

6.      Corporate decision-making with respect to passenger safety issues is centered at Uber's corporate headquarters in San Francisco. Decisions with respect to the vetting of Uber drivers and the supervision of Uber driver's *vis a vis* the safety of its passengers are made and implemented in its San Francisco, California headquarters.

## PARTIES

7.      Plaintiff is over the age of 18 and is a resident of Massachusetts, where the incident occurred.

8.      Defendant Uber Tech is a Delaware corporation with its corporate headquarters, principal office, and principal place of business at 1515 3rd Street, San Francisco, San Francisco County, California, 94158. Defendant Uber Tech may be served with process through its registered agent for service of process, CT Corporation System, located at 330 North Brand Boulevard, Suite 700, Glendale, California, 91203.

9.      Defendants Raiser and Raiser-CA are Delaware limited liability companies. Upon information and belief, Raiser is a wholly owned subsidiary of Uber Tech. Raiser and Raiser-CA maintain their corporate headquarters, principal office, and principal place of business at 1515 3rd Street, San Francisco, California, 94158.

10.      The true names and capacities, whether individual, plural, corporate, partnership, associate, or otherwise, of Does 1 through 50, inclusive, are unknown to Plaintiff who therefore sues said Defendants by such fictitious names. The full extent of the facts linking such fictitiously-sued Defendants is unknown

3

to Plaintiff. Plaintiff is informed and believes, and thereon alleges, that each Defendant designated herein as a Doe was, and is, negligent, or in some other actionable manner, responsible for the events and happenings hereinafter referred to, and thereby negligently, or in some other actionable manner, legally caused the hereinafter described injuries and damages to Plaintiff. Plaintiff will hereafter seek leave of the Court to amend this Complaint to show the Defendants' true names and capacities after the same have been ascertained.

11.    Plaintiff is informed and believes, and on that basis alleges, that at all times herein mentioned, each of the Defendants herein was the agent, servant, licensee, employee, assistant, consultant, or alter ego, of each of the remaining Defendants, and was at all times herein mentioned acting within the course and scope of said relationship when Plaintiff was injured as set forth herein.

12.    Plaintiff is informed and believes that each and every Defendant, when acting as a principal, was negligent in the selection, hiring, supervision or retention of each and every other Defendant as an agent, servant, employee, assistant, or consultant. Plaintiff is further informed and believes, and thereon alleges, that at all times herein mentioned, each business, public entity or corporate employer, through its officers, directors, supervisors and managing agents, and each individual Defendant, had advance knowledge of the wrongful conduct, psychological profile, and behavior propensity of said agents, servants, licensees, employees, assistants, consultants, and alter egos, and allowed said wrongful conduct to occur and continue to occur, thereby ratifying said wrongful conduct and, after becoming aware of their wrongful conduct, each public entity, and corporate Defendant by and through its officers, directors, supervisors and managing agents, and each individual Defendant, authorized and ratified the wrongful conduct herein alleged.

13.    Defendants are liable for the acts of each other through principles of respondeat superior, agency, ostensible agency, partnership, alter-ego, and other forms of vicarious liability.

14.     In the instance of the sexual assault described below, the Uber driver who perpetrated the assault described herein was an agent, servant, and employee of Uber.

## JURISDICTION AND VENUE

15.     Subject matter jurisdiction is proper under 28 U.S.C. 1332(a). The amount in controversy exceeds $75,000. Plaintiff is a resident and domiciled in the State of Massachusetts. Defendant Uber Tech is incorporated in Delaware and maintains its principal place of business in San Francisco, California. Defendants Raiser and Raiser-CA are California-based limited liability companies. Therefore, all parties are diverse.

16.     Personal jurisdiction over Uber is appropriate because Uber Tech, Raiser, and Ra-CA have their principal places of business in California and intentionally avail themselves of the benefits and protection of California law such that the exercise of jurisdiction by the California courts is consistent with traditional notions of fair play and substantial justice.

17.     Venue is proper under 28 U.S.C. § 1391(b)(1) as Defendants reside in this district.

## FACTUAL ALLEGATIONS

18.     Uber was founded in or around 2009, originally as UBERcab. In 2011, Uber launched its mobile application in San Francisco, California and changed its name to Uber Technologies, Inc.

19.     In May 2019, Uber became a public company via an initial public offering. As of 2019, Uber controlled approximately 67% of the ride-sharing market in the United States. Uber's mobile application is currently available in 72 countries and in over 10,000 cities worldwide.

20.     Uber designs, manufactures, produces and distributes a smart phone application ("Uber App") available to anyone to download onto a smart phone. First, a customer, using the Uber App, requests a ride in a motor vehicle. The Uber App matches the customer with an Uber driver, who is then dispatched

to pick up the customer and drive them to their destination. Uber controls every aspect of the financial transaction for each passenger trip between the customer, Uber, and the driver. Uber establishes the rate for a given ride by performing a calculation based upon the location information from the GPS-enabled mobile device and the destination. Uber drivers may not negotiate fares. Uber receives the customer fare by charging a standardized fee to the credit card that the customer provides to Uber when registering his or her personal information on the Uber app. Uber pays the Uber driver's portion of the fare to the driver. Uber retains a portion of every fare paid. Neither drivers nor riders are charged a fee to download the Uber App or a monthly subscription fee; instead, Uber's sole revenue source is fees from rides given.

21.     The Uber App is a product designed, patented, and distributed by Uber in San Francisco, California. It is a product designed and intended to connect riders looking for transportation to drivers. The Uber App processes payments for rides, tracks the rides, and acts as a platform for Uber drivers to be connected to passengers.

22.     As detailed below, Uber's business model is predicated upon having a large pool of available drivers in a given city in order to provide rides to as many customers as possible in as short a time as possible. In simpler terms, Uber only cares about growth because that is how Uber makes money for its officers and investors. Uber focuses on growth to the detriment of important public safety measures including, but not limited to, requiring cameras in Uber vehicles, conducting robust background checks on drivers, suspending drivers accused of sexually assaulting passengers, and/or committing an act of sexual misconduct towards a passenger, providing Uber drivers with proper training, making Uber passengers aware of the sexual violence epidemic on the Uber platform, and other common sense safety measures.

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1

## UBER'S FINANCIAL MODEL

2

3    23.    The key to Uber's business model is to have as many Uber drivers on the road as possible.

4 To achieve this, Uber endeavors to have as many new Uber drivers on the road as possible by soliciting

5 and retaining thousands of non-professional drivers. The more Uber drivers and Uber rides, the more

6 money Uber makes. Unfortunately, careful and adequate screening processes and driver supervision

7 would result in fewer drivers and lower profits. Uber employs its drivers in traditional at-will relationships,

8 in which Uber has the discretion to fire its drivers for any reason and at any time.

9    24.    Uber has high turnover among its drivers because they are not well paid and often move

10 on to other jobs. As a result, and to keep the number of drivers on the road at a maximum level, Uber's

11 business model and driver enrollment process is designed to accept as many new drivers as possible.

12 Unfortunately, Uber, including Uber's officers, directors and/or managing agents, prioritizes profits over

13 passenger safety.

14

15    25.    Uber's goal of dominating the ridesharing market has been a success because Uber ignores

16 licensing laws and disregards customer safety. While taxi and limousine companies must comply with

17 licensing laws and vehicle and consumer safety protections, Uber openly and intentionally disregards

18 long-standing legal and regulatory authorities in nearly every U.S. city in which it operates. Without the

19 costs of complying with legal and safety requirements and taking necessary precautions to ensure

20 consumer protection, Uber has become dominant in the market in a fraction of the time it would have

21 taken had Uber done things properly and safely for its passengers. Uber's model of "profits over safety"

22 is the cornerstone of its market dominance.

23

24    26.    As a result of prioritizing profits over passengers, Uber, at the direction of Uber's officers,

25 directors and/or managing agents, has made deliberate decisions to adopt inadequate initial screening

26

27

28

7

procedures, inadequate safety monitoring, and has failed to warn customers of the dangers of riding with Uber.

27.     Uber has falsely marketed itself as a safer, better alternative to other methods of transportation, particularly targeting young, intoxicated women and late-night riders with false representations that it enforces state-of-the-art safety policies and procedures.

28.     Additionally, Uber markets itself as the best transportation option after a night of drinking. In fact, Uber commissioned a report with Mothers Against Drunk Driving ("MADD") wherein it declared that "When empowered with more transportation options like Uber, people are making better choices that save lives."[1] Uber urged that, "Uber and MADD are working toward a world where a safe ride is always within reach and where drunk driving is a thing of the past." [2] Uber has also partnered with alcohol sellers touting itself as the safe option for arriving home when intoxicated, such as its promotional campaign with Budweiser, suggesting that one can "get home safe" after drinking with a free Uber ride.[3]

29.     What Uber does not make clear to its users, particularly young women who have been drinking, is that by choosing to ride with Uber after drinking, they are putting themselves at risk of sexual assault at the hands of sexual predators who drive for Uber.

30.     Uber, including Uber's officers, directors and/or managing agents, became aware that Uber drivers were sexually assaulting and raping female customers. At least as early as May 2013, sexual predators driving for Uber have continued to commit acts of sexual assault and misconduct against Uber's female passengers. At least as early as May 2013, Uber, including Uber's officers, directors and/or

---

[1] Uber Blog, Making Our Roads Safer – For Everyone,
http://web.archive.org/web/20171004001236/https://www.uber.com/blog/making-our-roads-safer-for-everyone-2/ (last visited Aug. 3, 2023).
[2] *Id.*
[3] Simon Gwynn, Budweiser partners with Uber for biggest responsible drinking campaign to date,
https://www.campaignlive.co.uk/article/budweiser-partners-Uber-biggest-responsible-drinking-campaign-date/1417545 (last visited Aug. 2, 2023).

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

managing agents, has known about the ongoing sexual assaults and misconduct by Uber drivers upon Uber customers. Complaints to Uber by female customers who have been attacked by Uber drivers, combined with subsequent criminal investigations by law enforcement, clearly establish that Uber, including Uber's officers, directors and/or managing agents, has been fully aware of these continuing attacks by sexual predators driving for Uber.

31.     Uber's response to this sexual predator crisis amongst Uber drivers has been appallingly inadequate. Uber, at the direction of Uber's officers, directors and/or managing agents, continues to hire drivers without performing adequate background checks. Uber continues to allow drivers who have prior complaints of sexual violence lodged against them to keep driving for Uber. And, most importantly, Uber, at the direction of Uber's officers, directors and/or managing agents, has failed to adopt and implement reasonable driver monitoring procedures including video surveillance designed to protect the safety of its passengers. As a result, Uber's passengers continue to be victims of sexual violence by Uber drivers.

## UBER'S INADEQUATE DRIVER SCREENING

32.     Uber employs its drivers through the Uber application, where the driver applicant merely has to download the Uber App onto his or her smartphone.

33.     Even today, the hiring of Uber drivers occurs without any real screening. Potential Uber drivers merely fill out a form online. There is no interview either in person or through online platforms such as Skype or Zoom. There is no biometric fingerprinting or fulsome criminal background checks. There is no verification that the social security numbers and other personal identification numbers submitted through the application process do, in fact, belong to the applicants. Uber does not verify vehicle ownership, conduct physical vehicle inspections, require applicants to pass road vehicle tests or vision and hearing exams, or require applicants to attend any training classes on safe driving skills. Uber does not require applicants to attend any training class or review any training materials about how to safely use

9

1   mobile apps such as the Uber App while driving. There has been no sexual assault training. Almost all
2   online applicants become drivers.

3   34.     Uber fails to engage investigators to perform ongoing audits of current drivers' applications
4   and information to weed out any inaccurate, outdated or forged information or criminal convictions
6   occurring since the driver applied with Uber.

### UBER'S BACKGROUND CHECKS ARE DEFICIENT

35.     As noted above, to focus on growth, Uber needs as many drivers as possible on the road so
that passengers do not have to wait for rides. To increase the number of drivers, Uber relies on a
background check system that is designed to get drivers approved as quickly as possible. By focusing on
growth, Uber has opted to not implement simple and common-sense safety measures, despite being aware
of the rampant sexual violence occurring on its platform. As a result, Uber utilizes a background-check
system designed to get drivers approved as quickly and conveniently as possible.

36.     Uber fails to conduct adequate background checks and screening of its drivers. Uber does
not fingerprint its drivers. Uber does not run the applicant drivers against all available U.S. public
databases. Uber does not perform international background checks.

37.     Uber generally does not perform driver background checks. Instead, Uber outsources the
checks to a third-party vendor that actually limits the scope and extent of those background checks and
does not verify that the information provided by the applicant is accurate or complete. The background
checks conducted by private companies for Uber do not require any fingerprinting. Neither Uber nor the
third-party vendors it uses for background checks verify that the information provided by applicants is
accurate or complete.

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

38.     For example, Uber hired Hirease, Inc. to do its background checks.[4] Hirease brags that it can vet drivers within 36 hours. To have such a short turnaround, Uber eschewed industry standards used by other taxi companies and livery services. For example, Uber abandoned fingerprinting — which takes weeks — and running applicant drivers against FBI records. These shortcuts might have led to growth for Uber, but they also put people, including Plaintiff, in danger because Uber was matching women with improperly screened drivers.

39.     Name-based background checks, on the other hand, are limited and not easily shared among the appropriate authorities. These criminal background checks are based only upon records from county courthouses, which are not linked to each other and typically do not go back past seven years. Because the FBI database is not accessed, Uber's background check does not include a true national search, making these searches incomplete, limited and inaccurate.

40.     Name-based background checks present systematic, fundamental problems. First, there is no way to positively identify a person via a biometric indicator, increasing the likelihood of fraud. Likewise, because names, addresses and birthdays are not unique, the likelihood of false positives (a person linked in error with another's record) and false negatives (someone getting cleared when they should not) are greatly increased. For example, if an individual changes her name, or for some other reason has a criminal history under a different name, the name-based checks can miss the individual's criminal history.

41.     Uber has refused to adopt fingerprint-based biometric checks and has in fact spent millions of dollars lobbying against local regulations requiring these checks.

---

[4] Mike Isaac, Uber's System for Screening Drivers Draws Scrutiny, The New York Times, Dec. 9, 2014 (available at https://www.nytimes.com/2014/12/10/technology/ubers-system-for-screening-drivers-comes-under-scrutiny.html#:~:text=Uber%20champions%20its%20%E2%80%9Cindustry%2Dleading,in%20the%20traditional%20taxi%20industry.)

42.     Uber lobbies state and local governments to limit what is required with respect to driver background checks. Uber also lobbies local government entities to continue allowing Uber to perform its own limited background checks of its driver applicants and resists any requirement that the municipalities perform the more stringent screening which they perform for traditional taxi drivers.

43.     Uber has successfully persuaded lawmakers in several states to limit the scope of the background check requirements for its drivers. As a direct result of Uber's lobbying efforts, Uber largely self-enforces hiring standards for their drivers.

44.     Despite Uber's aggressive advertising to passengers that "Your safety is important" and "Safety is our top priority," as described below, Uber's background check process is designed for speed, not safety. In refusing to adopt reasonable safety procedures and more robust driver screening, Uber makes clear that its priority is profit, not passenger safety.

45.     The application process to become an Uber driver is simple, fast, and designed to allow the company to hire as many drivers as possible while incurring minimal associated costs. Uber lobbied for and implemented a less robust hiring process knowing it would be at the expense of passenger safety.

**UBER'S SECURITY MEASURES ARE ALSO DEFICIENT**

46.     As noted above, Uber's driver application, intake, and background check procedures are deficient. Uber also refuses to adopt common-sense security measures including, but not limited to, installing cameras in Uber vehicles, properly training its drivers, allowing female passengers to elect a female driver, adopting a zero-tolerance sexual assault policy, and informing passengers of the sexual violence epidemic occurring on its platform.

47.     Uber refuses to require cameras in all rides. Video surveillance would deter acts of sexual assault and sexual misconduct. Moreover, video surveillance would assist law enforcement in the

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

investigation and prosecution of drivers who rape, assault, or otherwise sexually victimize passengers. Video surveillance would also allow victimized passengers to corroborate their allegations.

48.     Uber also refuses to allow female passengers to choose female drivers. Such an option would provide Uber's female passengers with sufficient autonomy to choose a female driver according to their preferences. Because the majority of sexual assaults and acts of misconduct on the Uber platform are perpetrated by male drivers, the ability to elect a female driver would significantly reduce the likelihood of sexual assault and misconduct on the Uber platform.

49.     Uber, including Uber's officers, directors and/or managing agents, does not require non-harassment training. Uber does not adequately investigate customer complaints of sexually inappropriate behavior or serious sexual assaults. Uber does not employ experts dedicated to investigating complaints of a violent or sexual nature made against its drivers. Upon information and belief, Uber coaches its employees responsible for investigating sexual violence incidents to place Uber's interests ahead of passenger safety.[5]

50.     To Plaintiff's knowledge, Uber does not bar registered sex offenders or individuals with rape convictions, or other acts of sexual misconduct, (at any point in the past) from becoming Uber drivers. Notwithstanding Uber's history of hiring sexual predators who have assaulted Uber passengers, Uber does nothing to warn its female passengers about the serious and real danger of being sexually assaulted by an Uber driver.

51.     Uber is and has been aware that its security and screening processes are insufficient to prevent dangerous and violent applicants from successfully registering as Uber drivers. Uber has not implemented effective policies to address how Uber drivers should deal with or interact with passengers

---

[5] Greg Bensinger, "When rides go wrong: How Uber's investigations unity works to limit the company's liability," The Washington Post, Sept. 26, 2019 (available at https://www.washingtonpost.com/technology/2019/09/25/ubers-investigations-unit-finds-what-went-wrong-rides-its-never-companys-fault/) (last visited Aug. 2, 2023).

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

incapacitated due to intoxication. As a result, Uber has fostered an environment in which sexual predators can thrive and go unchecked.

52.     Uber does not have a zero-tolerance policy for sexual assault or misconduct and has allowed drivers who have been reported for behavior that threatened the safety of its passengers to continue driving. Upon information and belief, Uber has continued to let sexual predators drive and interact with vulnerable members of the public after Uber has received reports of sexual assaults or misconduct by these predatory drivers. In many instances, Uber has allowed sexual predators to continue driving after Uber learned of the assaults or misconduct committed by those drivers.

53.     Uber's corporate management, including Uber's officers, directors and/or managing agents, has failed to implement the most basic and rudimentary procedures for the proper investigation of sexual assaults or misconduct that are reported in their vehicles.

54.     Corporate decision-making with respect to passenger safety is centered at Uber's corporate headquarters in San Francisco, California. Corporate decision-making with respect to policies and procedures for training and supervising drivers regarding sexual assault are centered at Uber's corporate headquarters in San Francisco, California. Corporate decision-making with respect to how Uber handles reports of sexual assault and misconduct is centered at Uber's corporate headquarters in San Francisco, California. Corporate decision-making and corporate instructions to Uber employees about refusing to cooperate with law enforcement investigating assaults and misconduct of their drivers is centered at Uber's corporate headquarters in San Francisco. Decisions with respect to the vetting of Uber drivers and the supervision and non-supervision of Uber drivers, *vis a vis* the safety of its passengers, are made and implemented in its San Francisco headquarters. Corporate decision-making with respect to Uber's decision not to report sexual assaults or misconduct to law enforcement and other ride sharing companies that employ the assailants is centered at Uber's corporate headquarters in San Francisco. Decisions with

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

respect to the design of the Uber App and implementation of changes with the Uber App that effect passenger safety are made and implemented in its San Francisco headquarters. Corporate decision-making with respect to Uber's policies and procedures to allow reported sexual predators to continue to drive for Uber is centered at Uber's corporate headquarters in San Francisco. Decisions regarding Uber's contract with its customers specifies that the agreement should be governed by California law. The specific officers, directors and managing agents responsible for the policies and procedures guiding Uber are centered at Uber's corporate headquarters in San Francisco, California.

## UBER'S FAILURE TO REPORT SEXUAL ASSAULTS

55.    Not only has Uber failed to adopt common-sense safety precautions, but Uber has also failed to properly inform the public of the sexual violence epidemic occurring on its platform.

56.    On or about December 5, 2019, Uber published a 2017-2018 US Safety Report that identified 5,981 instances of sexual assault reported to Uber as having occurred during an Uber ride. Prior to 2019, Uber did not publicly disclose any risk of sexual assault risk to the public. More importantly, Uber, at the direction of Uber's officers, directors and/or managing agents, has continually failed to take any meaningful steps to enact safety measures that would prevent these sexual violence incidents from occurring in the first place.

57.    But critically, Uber's 2019 disclosure was grossly inadequate. Uber's 2017-2018 US Safety Report adopts a taxonomy that includes ten different categories of sexual assault and eleven categories of sexual misconduct. In sum, Uber adopted a taxonomy of 21 categories that it utilized to catalogue incidents of sexual assault and sexual misconduct. However, Uber chose to not disclose the figures for sexual assault and misconduct for all 21 categories. Instead, Uber only disclosed the figures for five out of 21 categories. The number of sexual incidents in 2017 and 2018 is staggering. However, the reality that Uber only

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

released a partial subset of the numbers of sexual assaults and misconduct during this period is flabbergasting.

58.    According to Uber's inadequate Safety Report, there were 2,936 sexual assaults in 2017 alone. That is approximately eight sexual assaults per day that are taking place on the Uber platform. Further, 2,936 incidents of sexual assault only represents a limited portion of the actual number of sexual assaults and misconduct incidents on the Uber platform because Uber only provided data for five out of 21 categories of sexual violence and, as Uber is fully aware, many sexual violence incidents are widely underreported.

59.    According to Uber's inadequate Safety Report, there are 3,045 sexual assaults in 2018 alone. That comes to over eight sexual assaults a day. Again, the numbers Uber released to the public fail to include the other 16 categories of sexual assault and sexual misconduct t reported to Uber.

60.    On information and belief, Uber's cherry-picking five out of the 21 categories vastly understates the size and scope of Uber's sexual-violence epidemic. The scant numbers Uber has released only do not bear out the size of Uber's sexual-violence epidemic. Despite Uber's knowledge of how pervasive sexual assault and misconduct was and continues to be during Uber rides, Uber markets itself as a safe method of transportation, including for women and including for people who have been drinking. Thus, Uber not only fails to inform its passengers of the ongoing sexual violence epidemic on its platform, but Uber also fails to properly respond to allegations of sexual assault and misconduct.

**UBER RESPONDS INADEQUATELY TO RIDER REPORTS OF SEXUAL ASSAULT**

61.    Uber, at the direction of Uber's officers, directors and managing agents, refuses to adopt mandatory reporting and report the crimes being committed by Uber drivers on Uber rides to law enforcement agencies. This clearly sends a message to sexual predators that not only will they have access

to women in enclosed vehicles, but their attacks on these women will go unreported to law enforcement by Uber.

62.     Uber riders who report sexual violence to Uber are often left feeling no better off than had they not reported the incident at all. Even if Uber does respond to a report of sexual violence, the response largely follows the same script focusing on "apologizing for the situation," an 'investigation,' and safety. Uber, at the direction of Uber's officers, directors and managing agents, often does not tell the reporting victim what steps Uber takes in its 'investigation,' does not tell the victim if there have been other reports of sexual violence made against this driver, and does not tell the reporting victim what the conclusion of the 'investigation' is. Nor does Uber urge victims to report the incident to law enforcement.

63.     On information and belief, Uber's 'investigations' into reports of sexual violence amount to nothing more than following up with the rider and the driver and checking to see if the driver has any previous complaints against him. Additionally, Uber's investigators do not have an investigative or law enforcement background, nor are they properly trained in how to deal with victims of sexual violence.

64.     The results of these 'investigations' are not shared with the reporting victim, law enforcement, or other ridesharing companies, which would not only aid in actual law enforcement investigations, but would also ensure that drivers with a history of sexual violence are not allowed to continue driving and assaulting additional future victims.

### UBER'S CONTROL OVER ITS DRIVERS

65.     Uber drivers are largely non-professional, untrained individuals who use their own vehicles. Uber employs and engages its drivers, including Uber Driver, in traditional at-will relationships. Uber's control over its drivers includes, but is not limited to, the following:

      a. Uber has the discretion to fire its drivers for any reason and at any time; that is, Uber maintains the right to discharge its drivers at will, and without cause;

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

b.   Drivers are not charged a fee by Uber to apply to become employees;

c.   At all times relevant, there was no agreement between Uber and Driver designating Driver as an independent contractor;

d.   Drivers are not charged a fee to download the Uber App or to receive notifications from Uber that customers want rides;

e.   Fare prices for rides are set exclusively by Uber;

f.   Drivers have no input on fares charged to consumers;

g.   Drivers are not permitted to negotiate with consumers on fares charged;

h.   Uber establishes the driver requirements;

i.   Uber establishes the vehicle requirements;

j.   Uber can and does modify charges to consumers; for example, if Uber determines that a driver has taken a circuitous route to a destination;

k.   Uber takes a fee of every ride charged to a consumer, which generally exceeds twenty-five percent of the fare;

l.   Uber retains control over customer-contact information;

m.   Uber controls its drivers' contacts with its consumer base and considers its consumer list to be proprietary information;

n.   In some instances, Uber controls the hours a driver works;

o.   Drivers are not permitted to answer passenger inquiries about booking future rides outside of the Uber App;

p.   Drivers must abide by a list of regulations to drive for Uber;

q.   Uber requires its drivers to pick up Uber customers on the correct side of the street;

r.   Uber forbids its drivers from talking on their cell phones while the drivers are driving customers;

s.   Uber tracks drivers' speed and braking and sends drivers reports based on how many times the driver had to brake hard;

t.   Uber drivers are expected to accept all ride requests while they are logged into the Uber App. Uber Drivers who reject too many ride requests risk facing discipline, including suspension or termination;

u.   Uber provides its drivers with and requires them to use and display Uber branding materials in order to make their drivers easily identifiable as Uber drivers; and

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

v.  Uber allows its passengers to give feedback on rides they have taken, and rate drivers on a scale from one to five stars. Prior complaints about the driver are not shared with other passengers. Uber passengers are not provided with any background information regarding their driver other than a photograph and other basic information about the vehicle.

66.   Uber is a common carrier under California law and the common law. As such, Uber owes its passengers the highest degree of care. Consistent with its role as a common carrier, Uber prohibits drivers from refusing to provide services based on race, national origin, religion, gender, gender identity, physical or mental disability, mental condition, marital status, age, or sexual orientation.

67.   Consistent with its role as a common carrier, Uber expects its drivers to comply with all relevant state, federal, and local laws governing the transportation of riders with disabilities, including the transporting of service animals.

68.   Consistent with its role as a common carrier, Uber is liable for assaults regardless of whether such acts were committed within the course and scope of employment for Uber.

## UBER'S AGGRESSIVE MARKETING MISREPRESENTS SAFETY ON ITS PLATFORM

69.   Since its inception, Uber has actively marketed itself as a safe company that provides safe rides. Beginning in May 2013, Uber has actively and aggressively marketed the supposed safety of its transportation services. These efforts continue to this day, and include email messages sent to every Uber customer, including Plaintiff.

70.   Uber represents to its potential passengers, on its website, all the following:

a.  "Safety for all - Protecting Communities - A Positive Influence- There's a strong correlation between Uber's presence in cities and a reduction in drunk driving. And we've partnered with Mothers Against Drunk Driving (MADD) in the US to raise awareness about safer ways to get home. Because having more options leads to better outcomes."

b.  "Like the cities we operate in, Uber is always on. And that counts extra in times of emergency, when getting a reliable ride to a safe destination is most vital."

c. "Where public safety meets the road - The wide reach of our network of driver-partners helps us better protect communities"

d. "Safe rides, safer cities - Going the distance for everyone on the road - Safety is important to us—whether you're in the back seat or behind the wheel. That's why we continue to develop technology that helps make millions of rides safer every day."

e. "Trip safety - Our commitment to riders - Uber is dedicated to keeping people safe on the road. Our technology enables us to focus on rider safety before, during, and after every trip."

f. "Getting a safe ride - Open to everyone, everywhere - All ride requests are blindly matched with the closest available driver. So there is no discrimination based on race, gender, or destination."

g. "Safety tools at your fingertips - Access safety tools and tips directly from the map during every ride. You can also learn about the things we're doing to help keep you safe, including driver screening processes and insurance protection."

h. "After the trip - Always here for you - Rapid response - Our specially trained incident response teams are available around the clock to handle any urgent concerns that arise."

71.     Uber actively and publicly markets its transportation services to be safe and reliable services. Uber has cultivated an image among its customers of safety and has falsely claimed superiority over public transportation and traditional taxis. Because of aggressive and deceptive marketing, most Uber customers are generally unaware of the real risks associated with Uber rides and continue to believe a ride with Uber is a safer and better alternative.

72.     Riders, including Plaintiff, reasonably rely on Uber's representations and promises regarding safety and security measures. Riders, including Plaintiff, choose to ride with Uber as a result of this reliance.

73.     In 2014, Uber's executives in San Francisco started charging Uber passengers an extra $1 fee for each trip. Uber called this a Safe Rides Fee. When Uber announced the Safe Rides Fee, it told the public that the fee supported Uber's continued efforts to ensure the safest possible platform for Uber riders

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

and drivers, including an industry-leading background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and insurance. The Safe Rides Fee was not split with drivers.[6] Thus, the Safe Rides Fee was pure revenue for Uber. Uber gave hundreds of millions of rides charging the Safe Ride Fee, and made hundreds of millions in revenue from the fee.[7] But it never earmarked the money for improving safety or spent it on safety.[8] Instead, Uber pocketed the money while telling the world it was going towards safety. As a former Uber employee told a New York Times reporter, "[w]e boosted our margins saying our rides were safer." It "was obscene."[9] The idea for the Safe Rides Fee was crafted by an Uber managing agent. Discovery will reveal the identity of this managing agent.

74.     In 2016, Uber agreed to pay $28.5 million to settle a class action lawsuit over its fraudulent marketing of its security screening as "industry-leading."

75.     Uber knew its representations and promises about rider safety were false and misleading, yet Uber continued to allow riders to believe in the truth of these representations and promises and continued to profit from the fact that Uber passengers rely on those representations and promises.

## UBER IS A MAGNET FOR SEXUAL PREDATORS

76.     Uber markets itself as a safe way for people to get around after they have been drinking.

77.     Over the years, as Uber became more popular, men realized what was going on. They realized that if they became Uber drivers — a process that Uber has deliberately made as easy and as open as possible — they would get to have women, late at night, and sometimes intoxicated, get into their cars, where they would have unsupervised control over them.

---

[6] Mike Isaac, Super Pumped: The Battle for Uber (2019) ("The drivers, of course, got no share of the extra buck.").
[7] Id.
[8] Id.
[9] Id.

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

78.     In short, Uber has become a magnet for sexual predators. And these predators have realized there is no pushback from Uber. They have realized that Uber does not supervise them, will not report them to the police, and often will not fire them for sexual assault or misconduct. Uber's actions and inactions have only emboldened these sexual predators.

79.     Uber had actual knowledge that its drivers were preying on its passengers and sexually assaulting them at alarming rates. Uber's operations team "dealt with thousands of misconduct cases every year, including instances of sexual assault."[10] In some instances, Uber learned of the sexual violence from law enforcement. These reports of sexual violence put Uber on actual notice of its sexual violence epidemic.

80.     Uber attracts sexual predators because it is permeated by a toxic culture that disregards victims of sexual violence. For example:

   a. Uber employees and managing agents started regularly throwing parties at topless bars, often expensing the trips to Uber's corporate account.[11] They called it "Tits on Travis" Kalanick, Uber's co-founder and Chief Executive Officer ("CEO").[12]

   b. At a cocktail and dinner party with journalists in New York City, Emil Michael attacked journalists who criticized Uber.[13] He was particularly angry with Sarah Lacy who had, in a recent story, accused Uber of "sexism and misogyny" and had said she was going to delete her Uber App because she feared for her safety because of Uber's drivers.[14] Mr. Michael said that if any woman deleted her Uber App because of Ms. Lacy's story and was sexually assaulted, Ms. Lacy "should be held personally responsible."[15] He also floated the idea that Uber could spend a million dollars paying journalists and investigators to dig up dirt on journalists who wrote ill of Uber.[16] He then attempted to shame Ms. Lacy by suggesting that his hack journalists and investigators could find lots of dirt regarding Ms.

---

[10] Issac, *supra* note 5 at 166.
[11] Isaac, *supra* note 5, at 194.
[12] *Id.*
[13] Ben Smith, Uber Executive Suggests Digging Up Dirt On Journalists, Buzz Feed (Nov. 17, 2014) https://www.buzzfeednews.com/article/bensmith/Uber-executive-suggests-digging-up-dirt-onjournalists.
[14] *Id.*
[15] *Id.*; Isaac, *supra* note 5, at 129.
[16] Smith, *supra* note 11.

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Lacy and her romantic relationship with her partner.[17] He said Uber could get away with this because "[n]obody would know it was us."[18]

c. Sarah Fowler wrote an explosive blog post detailing the toxic male culture and misogyny that was rampant within Uber.[19] Ms. Fowler articulated, in detail, how female Uber employees were subjected to sexual harassment and how male Uber employees who were considered to be high performers could accost women with impunity.

81.    The actions of Uber's executives and board members demonstrate both Uber's contempt for women and their safety, as well as myopia regarding the sexual violence epidemic on Uber's platform. Uber only cares about growth. This culture oozes throughout the company and endangers Uber's female riders.

82.    As Uber started receiving bad press relating to sexual violence incidents on its platform, Emil Michael's comments, and the Sarah Fowler affair, Uber realized it needed to appear to be making changes eradicating its toxic-male culture.  So, Uber held a company-wide meeting to announce changes. At the meeting, when Uber announced that it was going to increase its diversity and sensitivity by adding a female board member, David Bonderman, another Uber board member, chimed in, announcing to the company that the addition of a woman to the board meant "it's much likelier [there will] be more talking on the board."[20] Uber's "culture was poisoned from the very top."[21] Indeed, John William Gurley, a longtime Uber board member, a close confidant of Travis Kalanick, Uber's co-founder, sat on his hands and watched silently as Uber put in place a culture and policies that have hurt many innocent women, like Plaintiff.

---

[17] *Id.*; Isaac, *supra* note 5, at 129.
[18] Smith, *supra* note 11.
[19] Susan Fowler, Reflecting on One Very, Very Strange Year at Uber, (Feb. 19, 2017), https://www.susanjfowler.com/blog/2017/2/19/reflecting-on-one-very-strange-year-at-Uber.
[20] Mike Isaac and Susan Chira, David Bonderman Resigns From Uber Board After Sexist Remark, N.Y. TIMES, June 13, 2017, at A16 (available at https://www.nytimes.com/2017/06/13/technology/Uber-sexual-harassment-huffingtonbonderman.html?hp=&action=click&pgtype=Homepage&clickSource=story-heading&module=inline&region=topnews&WT.nav=top-news); Isaac, supra note 2, at 277.
[21] Isaac, *supra* note 5, at 280.

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

83.     To try and repair its tattered reputation, Uber hired former Attorney General Eric Holder and his law firm, Covington & Burling LLP, to investigate Uber's culture and work-place environment.[22]

84.     During his investigation, as detailed in the publicly released "Holder Report," former Attorney General Holder uncovered "a winding, repetitive list of infractions that had occurred across hundreds of global offices, including sexual assault and physical violence."[23]

85.     In May 2018, Uber acknowledged its "deeply rooted problem" of sexual assault. Uber proclaimed it was committed to solving the problem, stating that "we're making some important changes today."[24] Included in these "important changes" was Uber's promise to publish a "safety transparency report that will include data on sexual assaults . . . that occur on the Uber platform."[25]

86.     One change Uber did not make was warning passengers that Uber is a risky method of transportation for women because of the high number of women who are victims of sexually assault or misconduct by Uber drivers during Uber Rides. Nor did Uber provide its customers with a complete accounting of sexual violence on its platform. Uber, unlike the public, knew the risk to female Uber passengers because of all the complaints about Uber drivers that Uber received. However, Uber does not and has never provided a warning to users of the Uber App about the high incident of sexual assault and misconduct that occurs on the Uber platform.

87.     Uber "had so lowered the bar to become a driver that people who might have been prevented from driving in the official taxi industry could easily join Uber."[26] The decision to lower the bar was made by Travis Kalanick, Uber's co-founder, and other officers, directors, and managing agents.

---

[22] Isaac, *supra* note 5, at 280.
[23] Isaac, *supra* note 5, at 271.
[24] Uber, Turning the Lights On, https://www.Uber.com/newsroom/turning-the-lights-on/. (last visited August 4, 2023).
[25] *Id.*
[26] Issac, *supra* note 5 at 166.

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

And these decisions to lower the bar were made with actual knowledge that Uber passengers were being sexually assaulted at an alarming rate.

88.     But it wasn't just that Uber lowered the bar. As noted above, Uber failed to take adequate steps to make its rides safe; it failed to provide everything necessary for safe transportation of its passengers. For example, Uber failed to install video cameras in its cars. Such a step would have deterred many potential sexual predators. It failed to provide an option in the Uber App that allowed female riders to select rides with female drivers. And it failed to adopt adequate training of its drivers on issues of sexual assault and sexual harassment. That is, it failed to provide adequately trained drivers. These policies and the failure to take adequate safety precautions were put in place by Travis Kalanick and other officers, directors, and managing agents of Uber. The policy of refusing to warn passengers about the sexual violence risks was made by Travis Kalanick, Dara Khosrowshahi, Uber's current CEO, and other officers, directors, and managing agents. These managing agents at Uber knew that if they required cameras in Uber cars, fewer incidents of sexual assault and misconduct would occur during Uber rides. They knew that if they provided and option for females to select female drivers, fewer incidents of sexual assault and misconduct would occur during Uber rides. Uber knew that if they better trained their drivers in sexual-violence prevention, fewer incidents of sexual assault and misconduct would occur during Uber rides. But Uber intentionally refused to put these safety policies in place, with actual and constructive knowledge that not putting these policies in place made it highly probable that harm to female Uber passengers would result.

89.     As Uber became more popular, potential drivers realized that Uber had so lowered the bar that people with checkered backgrounds could drive for Uber. They began to realize that Uber had not implemented adequate safety precautions that might make it more difficult to get away with sexual assault and misconduct, like requiring video cameras in cars. The potential drivers discovered that Uber was

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

protecting drivers accused of sexual assault and misconduct by not reporting those assaults to law enforcement. They also realized that Uber was marketing itself to women as a safe mode of transportation, including after drinking. Because of these factors, Uber became a magnet for sexual predators — men who knew that driving for Uber meant they would get to drive around intoxicated women late at night. And, as stated earlier, Uber and its officers, directors, and managing agents — including Travis Kalanick — had actual knowledge that these incidents of sexual assault and misconduct were occurring because the victims of this sexual violence was reporting it to Uber. But Uber's officers, directors, and managing agents did nothing. They failed to start screening drivers adequately, or to require video cameras in cars. They failed to give Plaintiff an adequate warning about the risks of riding in an Uber as a woman. Uber's managing agents intentionally refused to take these safety measures and precautions with actual knowledge of the problem, and these officers, directors, and managing agents — including Travis Kalanick — had actual or constructive knowledge that refusing to implement these safety measures meant that there was a high probability that more harm would result to female passengers, including Plaintiff.

90.     In short, before Plaintiff was sexually assaulted, Uber's officers, directors, and managing agents — including Travis Kalanick — knew that female passengers were frequently being sexually victimized by Uber drivers. Uber's officers, directors, and managing agents also knew that Uber hadn't taken all the safety measures it could have or should have taken, and that because of Uber's failure to do so, more women were likely to be victims of sexual violence during Uber rides. In this way, Uber's officers, directors, and managing agents acted with conscious disregard to the safety of future female passengers, including Plaintiff.

91.     Moreover, Uber, because its passengers were complaining directly to Uber about being the victims of sexual assault and misconduct during Uber rides, Uber knew it had a sexual violence problem. But Uber failed to warn its passengers as to what was going on. Uber is an unsafe mode of transportation

for women who are riding alone, and Uber knew this to be so. But it did not provide its passengers with any warning of how unsafe Uber is for women. In fact, it concealed this fact from the public — a fact its female passengers and the public were unaware of. If Uber would have warned women that Uber was unsafe for women, fewer women would have been the victims of sexual violence.

## UBER'S PURPORTED SAFETY MEASURES ARE INADEQUATE AND FAIL TO PROTECT ITS PASSENGERS AGAINST SEXUAL VIOLENCE

92.     Uber has enacted several half-hearted safety measures that fall short of protecting female passengers from being subjected to sexual violence at the hands of Uber drivers.

93.     In response to bad publicity Uber has received regarding sexual violence on its platform, Uber, at the direction of Uber's officers, directors and managing agents, enacted some changes and safety measures that could and should have been implemented long ago.

94.     Most of these changes to the Uber App are meaningless and serve merely as simple window dressing for press releases. For example, one of these changes involved the addition of an in-app emergency button that a woman in distress could use to call 911. This however presupposes that a woman, in the midst of sexual violence is: (1) conscious; (2) cognizant enough to know to use the emergency button; and (3) has access to her phone to make use of the feature. Such a button does little to increase a passenger's safety, as a passenger could just as easily dial 911 on their cell phone as utilize an in-app emergency button. Additionally, this feature does nothing to prevent the sexual violence from occurring in the first place.

95.     Uber's officers, directors and managing agents have still refused to implement biometric fingerprinting or Live Scan background checks.

96.     Uber's officers, directors and managing agents have still refused to implement in-app surveillance cameras to record Uber rides and ensure customer safety.

27

97.    Uber's officers, directors and managing agents have still refused to intervene when a ride goes off course or ends before the destination is reached.

98.    Uber, including Uber's officers, directors and managing agents, understands that the purported safety features it has enacted are inadequate to prevent incidents of sexual assault and misconduct.

99.    Uber has not adopted a zero-tolerance policy for sexual assault and misconduct. Uber allows drivers to continue to drive for Uber even after Uber passengers have reported to Uber that the driver committed an act of sexual violence. Uber refuses to turn these drivers into law enforcement, or to prevent them from driving for Uber because taking such steps would hurt Uber's growth.

## **UBER PROTECTS ITS DRIVERS**

100.    Uber protects its drivers who are accused of sexual violence as a way to protect itself, grow, and make money. As noted throughout this Complaint, Uber has chosen to: (a) adopt a policy that it will not report sexual assault and misconduct occurring on the Uber App to law enforcement; (b) upon information and belief, not always cooperate with law enforcement investigations into allegations of sexual assault and misconduct occurring on the Uber App; and (c) refrain from adopting a zero-tolerance policy against sexual assault and misconduct.

101.    Uber also takes additional steps to protect its drivers, as well as Uber itself, from law enforcement or litigation-related scrutiny. Uber protects itself and its drivers from investigations into allegations of sexual assault and misconduct via multiple means, including Uber's concealment of driver's identities. For example, on its ride receipts, Uber does not include a driver's last name, but rather only lists the driver's first name. Moreover, when passengers report an incident of sexual assault or misconduct, or other driver-related incidents, Uber does not volunteer the last names of drivers to the complaining passengers.

102.     And after 30 days, Uber removes the license-plate numbers from ride receipts. Uber's policy of removing last names conceals, after 30 days, the true identities of the sexual predators from the sexual-violence survivors, making it more difficult for survivors to bring these predators to justice. Because of Uber's policy of removing the license plate, all sexual-violence survivors have to identify their predator drivers after 30 days are the driver's first name and a tiny headshot.

103.     Studies show that many sexual-violence survivors have a difficult time coming forward within 30 days. For those survivors unable to come forward within 30 days, Uber has effectively concealed from them the identities of the sexual predators.

104.     By adopting this policy of removing the license-plate numbers from the ride receipts, Uber is aiding and abetting its sexual-predator drivers and conspiring with them to protect its predator drivers and itself.

## JANE DOE F-1'S INJURY

105.     On or about July 8, 2018, Jane Doe F-1 was a passenger in an Uber vehicle. She was approximately 16 years old at the time. Jane Doe F-1's boyfriend at the time requested the ride for her so that she could return to her parent's house.

106.     When the Uber arrived, Jane Doe F-1 sat in the front seat of the Uber vehicle. Jane Doe F-1's ride was approximately two miles long.

107.     During the ride, Uber Driver started asking Jane Doe F-1 about her boyfriend's age. The Uber driver then proceeded to tell Jane Doe F-1 that she should be intimate with an older man. The Uber driver also told Jane Doe F-1 that she should be intimate with people from different races.

108.     During the ride, Uber Driver asked Jane Doe F-1 her age. Jane DOE F-1 told Uber Driver that she was 16 years old.

109.    When Uber Driver was approximately 200 feet from Jane Doe F-1's destination,  he pulled the car over and told Jane Doe F-1 that she should experiment with someone in his 30s. The Uber Driver added that all she needed was a chest, a vagina, and a face.

110.    Jane Doe F-1 asked the Uber Driver to leave her alone. Instead, he reached over and pulled Jane Doe F-1's shirt down exposing her breast.

111.    Jane Doe F-1 told Uber Driver that it was past midnight and her parents wanted her home by midnight. But despite being aware that she was a minor child, Uber Driver groped Jane Doe F-1's breast after encouraging her to have sex with him.

112.    Jane Doe F-1 was understandably shocked and scared by Uber Driver's behavior and his refusal to stop despite her requests. Eventually, after he had finished fondling her chest, Uber Driver dropped Jane Doe F-1 off at her parents' house.

## CAUSES OF ACTION

## COUNT ONE – GENERAL NEGLIGENCE

113.    The preceding paragraphs of this Complaint are incorporated by reference.

114.    By providing transportation to the general public using its application and network of drivers, and by charging its passengers, Uber owed a duty to act with due and reasonable care towards both the public and towards its own passengers, including Plaintiff.

115.    Uber has been on notice that its drivers have been sexually harassing and sexually assaulting its passengers since at least May 2013. Uber was aware or should have been aware that some significant subset of Uber drivers would continue to sexually assault, harass, physically assault, rape, or otherwise attack their vulnerable Uber patrons and passengers.

116.     Since learning of the sexual violence perpetrated by its drivers, Uber has never adopted appropriate safety measures and has failed to improve its limiting existing safety procedures in any meaningful way.

117.     Uber does not require video monitoring of its drivers, nor does it provide emergency notification to Uber and the authorities when a driver drastically veers off-course from the passenger's destination, abruptly cancels the ride, or ends the ride at the intended destination but GPS data indicates the passenger remains in the car for a significant period.

118.     At all relevant times, Uber was aware of the dangers its drivers posed to its passengers, yet it still induced, and continues to induce, the public, including Plaintiff, to rely on Uber as a safe means of transportation. In doing so, Uber failed to warn passengers, including Plaintiff, of the possibility of being sexually assaulted, sexually battered, raped, falsely imprisoned, stalked, harassed, or otherwise victimized by an Uber driver.

119.     At the time Plaintiff was sexually assaulted, Uber did not require sexual harassment or sexual assault training for its drivers, nor did it have any policies in place for immediate termination if a driver engaged in sexual violence.

120.     Uber does not cooperate with law enforcement when a driver commits an illegal sexual attack on its passengers. Despite having the express right to disclose driver information at Uber's sole discretion, Uber requires extensive standards be met before the company will even consider law enforcement requests for information. Even after a report of sexual assault has been made, Uber generally requires a subpoena before it will release information. Uber's policy of non-cooperation discourages law enforcement agencies from making recommendations to District Attorneys' offices to file complaints against Uber drivers, and provides Uber's predatory drivers with tacit assurance that their illegal attacks will not be detected by law enforcement.

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

121.     When hiring new drivers, Uber does not verify driver identities with biometric background checks. Uber does not correct for false negatives created by its name-based screening procedures. Uber does not provide industry-standard background checks, which would provide the most comprehensive means of screening applicant drivers. Uber does not invest in continuous monitoring of its drivers, and is not immediately alerted when one of its drivers is implicated in criminal acts.

122.     Uber does not have a consistent, reliable system for addressing passenger reports of sexual violence by its drivers and continues to let dangerous predators drive for and earn money for Uber.

123.     Uber does not interview, check the references of, provide training to, or advise the Uber drivers of any anti-sexual violence policies when hiring them. Uber had no reasonable basis for believing Uber drivers in general were fit to drive vulnerable women around, particularly at night, or when intoxicated, and failed to use reasonable care in determining whether each driver was fit for the task. Uber should have known of the unfitness of the Uber Driver involved in the assault described herein but failed to use reasonable care to discover their unfitness and incompetence.

124.     Despite failing to reasonably endeavor to investigate the incompetence of Uber drivers, including the Driver who harmed Plaintiff, for transporting vulnerable or intoxicated women late at night in a moving vehicle, Uber hired said drivers to do exactly that.

125.     Uber knew or should have known that assigning the task of transporting vulnerable passengers late at night to an inadequately-screened driver created an unreasonable risk of harm to Uber's passengers, including Plaintiff, particularly when Uber had been on notice of the string of sexual violence committed by Uber's drivers.

126.     Uber failed to employ measures to adequately supervise its drivers.

127.     Uber failed to adequately record, investigate, and respond to passenger reports of unsafe conduct such as sexual assault and misconduct by Uber drivers.

128.   Uber was negligent in failing to terminate drivers it knew or reasonably should have known were a threat to passengers, including but not limited to Plaintiff and other vulnerable female passengers traveling alone.

129.   The Uber Driver who assaulted Plaintiff was, or became, unfit to perform the work for which he was hired as he improperly and illegally took advantage of Plaintiff when she attempted to use the service for a safe ride to her destination, thereby causing psychological and physical harm.

130.   Because of the Uber driver's unfitness to perform the task of transporting Plaintiff, Plaintiff was sexually assaulted,  which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety.

131.   Uber's conduct created a risk of physical and emotional harm to its passengers, including Plaintiff.

132.   In operating its business, Uber knew and had reason to know that its passengers were at risk of sexual violence by Uber's drivers since at least May 2013. Since then, Uber has received frequent passenger complaints about driver misbehavior, has been notified of law enforcement investigations of drivers' criminal conduct while acting within their capacity as Uber drivers, and has been the subject of numerous civil suits alleging sexual assault and misconduct of Uber's passengers by Uber's drivers.

133.   Despite the knowledge of the danger its enterprise created, Uber prioritized profits over passenger safety and did not alert its passengers, including Plaintiff, to the risk of sexual assault, harassment, kidnapping, physical assault, rape, and other misconduct by Uber drivers. In fact, Uber continued to market itself as a service that provides "safe" rides, even to unaccompanied or intoxicated passengers, knowing sufficient measures had not been employed to keep passengers safe from being the victims of sexually assault or misconduct.

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

134.   Uber itself represented to its passengers that riding with Uber is safe, implying it is free of risk from sexual violence.

135.   Uber did not warn Plaintiff, or the public, that its criminal background checks were limited, nor did it warn that it sometimes allows drivers to continue driving for Uber even after a passenger reports that the driver committed an act of sexual assault or misconduct during an Uber ride. Thus, Uber knew that it was keeping its passengers in the dark about the sexual violence threats lurking on the Uber platform.

136.   A warning to its passengers that they were at risk of sexual violence by Uber drivers would have reduced the risk of harm to passengers, including Plaintiff, who could have arranged for alternative transportation or taken additional safety precautions and avoided the sexual assault she suffered at the hands of Uber Driver.

137.   Plaintiff would not have ridden alone in an Uber had Uber provided an adequate warning regarding the risk of being sexually assaulted, sexually battered, raped, falsely imprisoned, stalked, harassed, or otherwise victimized attacked by an Uber driver.

138.   In doing those things alleged herein above, Defendant Uber acted negligently, carelessly, and recklessly, resulting in serious injury to Plaintiff.

139.   In doing those things alleged herein above, Uber breached its duty of reasonable care to Plaintiff. As a legal and direct result of Uber's conduct and omissions, Plaintiff was sexually assaulted by an Uber Driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The sexual assault on Plaintiff caused her to suffer psychological and physical harm from which she may never fully recover.

140.   As a direct and legal result of Uber's general negligence, Plaintiff suffered damages, both economic and general, non-economic damages, according to proof.

## COUNT TWO - COMMON CARRIER NEGLIGENCE

141.     The preceding paragraphs of this Complaint are incorporated by reference.

142.     At the time Plaintiff was sexually assaulted, Uber was a common carrier as it provided transportation to the general public.

143.     Uber provides transportation through a digital application made available to the general public for the purpose of transporting its users, the passengers, from place to place for profit. Uber has widely offered its services to the general public and charges standard fees for its services through its application. Uber does not allow discrimination against passengers on the basis of race, color, national origin, religion, gender, gender identity, physical or mental disability, medical condition, marital status, age, or sexual orientation. Any member of the public can use Uber's services for transportation.

144.     Uber is a common carrier. As such, Uber has a duty to carry its passengers, including Plaintiff, safely. Uber has a duty to employ the utmost degree of care and diligence that would be expected of a very cautious company.

145.     Uber must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and the practical operation of the business. Despite complaints to Uber of sexual violence committed by Uber drivers and lawsuits against Uber for sexual violence, Uber has failed to implement safety precautions that would adequately address its sexual violence problem.

146.     Uber does not provide a consistent and reliable way for passengers to report incidents of sexual assault or misconduct. Moreover, Uber does not warn passengers of the dangers of riding with Uber and fails to warn passengers of past complaints regarding Uber drivers.

147.     Uber does not have an effective program in place to deal with the sexual predator crisis posed by some of its drivers.

148.     Uber knows its female passengers are in a uniquely vulnerable situation locked in a moving vehicle, and that a subset of its drivers are sexual predators. Accordingly, Uber has not exercised reasonable care to protect its passengers from sexual violence by Uber's drivers.

149.     Uber has not exercised the utmost degree of care in order to protect its passengers from the danger posed by sexual predators who drive for Uber. If Uber had used the highest degree of care, Uber could have prevented or dramatically reduced the likelihood of sexual violence of its passengers, including Plaintiff.

150.     Uber failed to safely transport Plaintiff.

151.     Uber failed to take reasonable precautions to protect its vulnerable female passengers, including Plaintiff, from the foreseeable and known risk of sexual assaults, harassment, kidnapping, physical assaults, rapes or other misconduct by its drivers which humiliated, degraded violated, and robbed Plaintiff of her dignity and personal safety. The sexual assault on Plaintiff caused her to suffer both psychological and physical harm from which she may never fully recover. If Uber had used the highest degree of care, Uber could have prevented or reduced the likelihood of sexual violence of its passengers, including Plaintiff.

152.     As a legal and direct result of the conduct and omissions of Uber, Plaintiff was sexually assaulted by an Uber driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The attack on Plaintiff caused her to suffer both psychological and physical harm from which she may never fully recover.

153.     As a direct and legal result of Uber's negligence as a common carrier, Plaintiff has suffered damages, both economic and general, non-economic damages according to proof.

**COUNT THREE – NEGLIGENT HIRING, RETENTION, AND SUPERVISION**

154.     The preceding paragraphs of this Complaint are re-alleged and incorporated by reference.

36

155.    Uber engaged and retained or otherwise employed Uber Driver, who sexually assaulted Plaintiff as described above.

156.    Uber did not properly interview, if at all, check the references of, provide training to, or advise the Uber driver of any anti-sexual violence policies when hiring him. Uber had no reasonable basis for believing Uber drivers in general were fit to drive vulnerable women around, particularly at night, or when intoxicated, and failed to use reasonable care in determining whether the driver in question was fit for the task.

157.    Uber should have known of the unfitness of the Uber driver involved in the sexual assault on Plaintiff but failed to use reasonable care to discover his unfitness and incompetence.

158.    Despite failing to reasonably endeavor to investigate the incompetence of Uber drivers, including the one who harmed Plaintiff, for transporting vulnerable or intoxicated women in a moving vehicle, Uber hired said driver to do exactly that.

159.    Uber knew or should have known that assigning the task of transporting vulnerable passengers to an inadequately screened driver created an unreasonable risk of harm to Uber's passengers, including Plaintiff, particularly when Uber had been on notice of the string of sexual violence committed by Uber's drivers.

160.    Uber failed to employ measures to adequately supervise its drivers.

161.    Uber failed to adequately record, investigate, and respond to passenger reports of unsafe conduct such as sexual assault and misconduct by Uber drivers.

162.    Uber was negligent in failing to terminate drivers it knew or reasonably should have known were a threat to passengers, including but not limited to Plaintiff and other vulnerable female passengers traveling alone.

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

163.    The Uber driver who sexually assaulted Plaintiff was, or became, unfit to perform the work for which he was hired as he improperly and illegally took advantage of Plaintiff when she attempted to use the service for a safe ride to her destination, which caused her psychological and physical harm.

164.    Because of the Uber driver's unfitness to perform the task of transporting Plaintiff, Plaintiff was sexually assaulted, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety.

165.    Uber's negligence in hiring, retaining, and supervising Uber drivers, including Uber Driver who harmed Plaintiff, caused Plaintiff to be sexually assaulted, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and psychological harm from which she may never fully recover.

166.    As a direct and proximate result of Defendants' negligent supervision, hiring, and retention of Uber drivers, including Uber Driver, Plaintiff suffered economic and non-economic damages.

167.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

## COUNT FOUR – NEGLIGENT FAILURE TO WARN

168.    The preceding paragraphs of this Complaint are re-alleged and incorporated by reference.

169.    Uber's conduct created a risk of physical or emotional harm to its passengers, including Plaintiff.

170.    In operating its business, Uber knew and had reason to know that its passengers were at risk of sexual assault and misconduct by Uber's drivers since at least May 2013. Since then, Uber has frequently received passenger complaints about driver misbehavior, has been notified of law enforcement investigations of drivers' criminal conduct while acting in their capacity as Uber drivers, and has been the subject of numerous civil suits alleging the sexual violence of Uber's passengers by Uber's drivers.

171.    Despite the knowledge of the danger its enterprise created, Uber prioritized profits over passenger safety and did not alert its passengers, including Plaintiff, to the risk of physical and sexual violence by Uber drivers. In fact, Uber continued to market itself as a service that provides "safe" rides, even to unaccompanied or intoxicated passengers, knowing sufficient measures had not been employed to keep passengers safe from being the victims of physical or sexual violence.

172.    Uber itself represented to its passengers that riding with Uber is safe, implying it is free of risk from physical and sexual violence.

173.    Uber did not warn that its criminal background checks of Uber drivers were limited, nor did it warn that it sometimes allows drivers to continue driving for Uber even after a passenger reports to Uber that she was the victim of physical or sexual violence.

174.    Uber had reason to know that passengers would be unaware of the risk of physical and sexual violence by Uber drivers. A warning to its passengers that they were at risk of physical or sexual violence by Uber drivers would have reduced the risk of harm to passengers, including Plaintiff, who could have arranged for alternative transportation or taken additional safety precautions and avoided the violence they suffered at the hands of Uber drivers.

175.    Plaintiff would not have ridden alone in an Uber had Uber provided an adequate warning regarding the risk of being sexually assaulted, battered, harassed, or otherwise attacked by an Uber driver.

176.    As a legal and proximate result of Uber's actions and omissions, Plaintiff was sexually assaulted by Uber Driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and psychological harm from which she may never fully recover.

177.    As a direct and proximate result of Defendants' negligent failure to warn, Plaintiff suffered economic and non-economic damages.

178.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

## COUNT FIVE – NEGLIGENT MISREPRESENTATION

179.    The preceding paragraphs of this Complaint are re-alleged and incorporated by reference.

180.    Uber represented to Plaintiff and the general public that safety is Uber's top priority, and that it is Uber's goal to make every ride safe, comfortable, and reliable. At the time of the alleged sexual assault, Uber knew that a number of its drivers had previously preyed on vulnerable female passengers by sexually harassing and assaulting them.

181.    Uber continued to represent that its services were safe to further Uber's own pecuniary interests. In representing to its customers and users that its services were safe, Uber had a duty to provide correct and accurate information about the actual safety of its services.

182.    Uber knew or should have known that it could not provide the safe ride that it represented. Knowing the incidence of sexual assault, harassment, kidnapping, physical assault, rape, and other misconduct perpetrated against its passengers by its drivers and knowing that Uber had not implemented adequate precautions, Uber had no reasonable grounds for believing that it could provide Plaintiff and other passengers a safe ride home as represented.

183.    In getting into the Uber, Plaintiff reasonably relied on Uber's representations that it would get her safely to the intended destination.

184.    In trusting and relying on Uber's representations, Plaintiff was placed in a uniquely vulnerable position that was taken advantage of by an Uber employee, an Uber driver, who sexually assaulted her.

185.    As a legal result of Uber's conduct, Plaintiff was sexually assaulted, which humiliated, degraded, violated, and robbed her of her dignity and personal safety. The depraved attack on Plaintiff caused her to suffer both physical and psychological harm from which she may never fully recover.

186.    As a legal result of Uber's negligent misrepresentations, Plaintiff has suffered damages, both economic and general, non-economic damages according to proof.

## COUNT SIX – INTENTIONAL MISREPRESENTATION

187.    The preceding paragraphs of this Complaint are re-alleged and incorporated by reference.

188.    At the time Plaintiff was sexually assaulted, Plaintiff had downloaded the Uber App and had an account with Uber.

189.    Uber represented to Plaintiff as true that the Uber App was safe to use, and that Plaintiff would be safely taking Uber rides with drivers whose backgrounds had been properly screened by Uber, and Uber would provide a safe experience. Uber's representation was false. Uber had not properly screened its drivers in a meaningful way and their drivers posed a grave threat to Plaintiff's safety and well-being, and Uber did not provide Plaintiff with a safe experience.

190.    Uber knew that its representations made about safety were false when the statements were made, or at a minimum, made the representations recklessly and without regard for their truth.

191.    Uber made these representations to Plaintiff and the general public despite knowing that it had chosen not to take the measures necessary to provide a safe ride home and that, as a result, continued sexual assault, harassment, kidnapping, physical assault, rape, and other misconduct perpetrated against passengers by its drivers were a foreseeable occurrence. Uber made these representations to induce individuals like Plaintiff into using Uber's services and to derive profit from individuals like Plaintiff.

192.    Uber intended that Plaintiff rely on its representations about safety. In fact, Uber made these misrepresentations with the intent to cause Plaintiff to rely on this false information to induce

Plaintiff to utilize Uber's services despite any concerns Plaintiff might otherwise have about the safety of Uber's services.

193.    Plaintiff actually and reasonably relied on the representations made by Uber when she agreed to utilize Uber's services after being informed that Uber stringently screened its drivers and took measures to ensure it provided passengers safe transport.

194.    In getting into the Uber ordered for Plaintiff, Plaintiff reasonably relied on Uber's representations that it would get her safely home.

195.    In trusting and relying on Uber's representations, Plaintiff was placed in a uniquely vulnerable position that was taken advantage of by Uber's employee, Uber Driver, who sexually assaulted Plaintiff.

196.    Plaintiff's reliance on Defendant Uber's representations was a substantial factor in causing the harm suffered by Plaintiff. As a legal result of Uber's intentional misrepresentation, Plaintiff was sexually assaulted, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer both psychological and physical harm from which she may never fully recover.

197.    As a legal result of Uber's intentional misrepresentation, Plaintiff suffered damages, both economic and general, non-economic damages according to proof.

**COUNT SEVEN – VICARIOUS LIABILITY/LIABILITY FOR TORTS OF UBER DRIVER**

198.    The preceding paragraphs of this Complaint are re-alleged and incorporated by reference.

199.    Uber is vicariously liable for the torts of its drivers through the theories of respondeat superior, nondelegable duties, agency, and ostensible agency. Uber's liability for the acts of its drivers is not contingent upon the classification of its drivers as employees.

200.   Under the doctrine of respondeat superior, Uber is responsible for the torts of its employees committed within the scope of employment. The modern rationale for the theory is that an employer who profits from an enterprise which, through the torts of his employees, causes harm to others, should bear the costs of the injury instead of the innocent injured Plaintiff.

201.   Uber profits from transporting vulnerable passengers late at night. Uber encourages intoxicated passengers to use its services. At the same time, Uber does not take reasonable steps to protect its passengers or warn them of the dangers of riding with Uber. Uber should bear the costs of injuries that result from torts such as sexual assault and misconduct; not the victims of Uber's negligence, willful wrongdoing and intentional omissions made at the expense of passenger safety.

202.   Uber drivers are employees and agents of Uber. Uber reserves the right to control the activities of Uber drivers. Uber controls the prices charged to customers, controls contact with the customer base, controls the ability of a driver to see where he will be driving before accepting a ride, and reserves the right to terminate drivers with or without cause.

203.   The sexual assault Plaintiff suffered was perpetrated by Uber Driver within the scope of his employment and authority. The sexual assault and misconduct of intoxicated and unaccompanied women who have been placed in an improperly screened Uber driver's car with little to no supervision is incidental to and a foreseeable result of the act of transporting passengers.

204.   Uber may maintain that its drivers are contractors and not employees. Nevertheless, whether Uber drivers are characterized as contractors, employees or agents, Uber has a non-delegable duty to transport its passengers safely.

205.   The doctrine of non-delegable duty recognizes that for public policy reasons, certain duties cannot be delegated to a third party. It operates to ensure that when a harm occurs, the injured party will be compensated by the party whose activity caused the harm and who may therefore properly be held

liable for the acts of his agent, whether the agent was an employee or an independent contractor. The doctrine recognizes that an entity may not delegate its duties to a contractor to evade its own responsibilities. This is especially so when allowing delegation would incentivize an employer to hire incompetent contractors in order to further the employer's pecuniary interests.

206.   In advertising to passengers, including Plaintiff, that Uber provides them a safe ride to their destinations, and by profiting off women who use Uber for that very purpose but then are attacked, Uber has a duty to its passengers that cannot be delegated. To allow Uber to delegate the liability for the sexual violence committed by its drivers to anyone else would encourage Uber to continue to utilize the cheapest, fastest, and most haphazard safety procedures. Uber would be disincentivized from hiring only competent drivers, since the more drivers Uber has, the more money Uber makes.

207.   Further, Uber drivers act as agents of and operate as extensions of Uber. Uber drivers represent Uber's business and further Uber's pecuniary interests.

208.   Uber drivers display the Uber logo when interacting with passengers, and in many cases Uber drivers are the only people with whom Uber's passengers have direct contact. Uber drivers provide the service that Uber claims to provide-- transportation.

209.   By allowing Uber drivers to represent Uber's business, Uber creates the impression that its drivers, including Uber Driver, were Uber's employees or agents.

210.   Plaintiff reasonably believed that Uber Driver was an employee or agent of Uber and, relying on this belief, got in a vehicle with him in exchange for a fee, and suffered harm as a result of her contact with Uber Driver.

211.   For these reasons and others, Uber is vicariously liable for the tortious acts of its drivers, regardless of whether Uber's drivers are employees, agents, apparent agents, or contractors of Uber.

212.    As a direct and legal result of Uber Driver's tortious conduct, Plaintiff was sexually assaulted, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer both physical and or psychological harm from which she may never fully recover.

213.    As a direct and legal result of Uber Driver's tortious conduct for which Uber is legally liable, Plaintiff suffered economic and general, non-economic damages according to proof.

## COUNT EIGHT – VICARIOUS LIABILITY FOR SEXUAL ASSAULT

214.    The preceding paragraphs of this Complaint are re-alleged and incorporated by reference.

215.    At the time Plaintiff was sexually assaulted, Uber Driver intended to cause harmful and offensive contact with Plaintiff, and placed Plaintiff in a reasonable apprehension of imminent, harmful, and offensive contact. Uber Driver intentionally and recklessly did acts that placed Plaintiff in apprehension of imminent harm, including being sexually assaulted and robbed Plaintiff of her dignity and personal safety.

216.    Plaintiff was sexually victimized by Uber Driver, who was acting in the course and scope of his employment with Uber as an employee or agent of Uber. Therefore, Uber is liable for Uber Driver's sexual assault of Plaintiff and is responsible for damages caused by said conduct under the principles of vicarious liability, including the doctrine of respondeat superior. Even if Uber Driver had not been an employee, Uber's duty to provide transportation free of sexual assault is non-delegable. And so, Uber is liable for its drivers' actions, because to allow Uber to delegate its duty of providing the safe transportation it promises would incentivize Uber to create a greater risk of harm to the public. For these reasons and others, Uber is vicariously liable for the sexual assault Plaintiff suffered at the hands of Uber Driver.

217.    As a direct and legal result of Uber Driver's sexual assault, Plaintiff was humiliated, degraded, violated, and robbed of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer both physical and psychological harm from which she may never fully recover.

218.    As a direct and legal result of Uber Driver's sexual assault for which Uber is vicariously liable, Plaintiff suffered economic and general, non-economic damages according to proof.

219.    Uber is vicariously liable for the torts of its drivers under the theory of respondeat superior, the non-delegable duty doctrine, agency, and ostensible agency.

## COUNT NINE – VICARIOUS LIABILITY FOR SEXUAL BATTERY

220.    The preceding paragraphs of this Complaint are re-alleged and incorporated by reference.

221.    Here, Uber Driver made harmful and offensive contact with Plaintiff. Plaintiff did not consent to the contact. Plaintiff was harmed and offended by Uber Ddriver's contact. Uber Driver intentionally and recklessly committed acts resulting in harmful contact with Plaintiff's person, including but not limited to sexual molestation or penetration, touching of a sexual body part without consent, touching of Plaintiff in a sexual manner, forced kissing without consent, or forcing Plaintiff to touch Uber Driver in a sexual manner.

222.    As a result of Uber Driver's sexual assault ofPlaintiff, which occurred while in the course and scope of Uber Driver's employment, Plaintiff was sexually assaulted, which humiliated, degraded, violated, and robbed of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer both physical and psychological harm from which she may never fully recover.

223.    As a legal result of the sexual battery committed by Uber Driver, and Uber's liability and vicarious liability for the same, Plaintiff suffered damages, both economic and general, non-economic damages according to proof.

224.    Uber is vicariously liable for the torts of its drivers under the theory of respondeat superior, the non-delegable duty doctrine, agency, and ostensible agency.

225.

## COUNT TEN – STRICT PRODUCT LIABLITY/FAILURE TO WARN

226.    The preceding paragraphs of this Complaint are re-alleged and incorporated by reference.

227.    Uber manufactured and distributed the Uber App.

228.    The Uber App presented potential risks of introducing each driver to a passenger who, because of the nature of the ridesharing arrangement created and facilitated by the Uber App, could neither escape from an Uber driver's vehicle nor control the place where the Uber driver would take the passenger, which could result in sexual violence of that passenger. These are risks that were known or knowable at the time of manufacture and distribution of the Uber App.

229.    The potential risks presented a substantial danger when the Uber App was used or misused in an intended or reasonably foreseeable way.

230.    Ordinary consumers such as Plaintiff would not have recognized the potential risks.

231.    Uber failed to adequately warn consumers, including Plaintiff, of these potential risks. Uber's failure to provide passengers, including Plaintiff, with sufficient warnings regarding the risk of harm to which they were being exposed with each Uber ride was a substantial factor in causing the harm suffered by Plaintiff. Plaintiff wassexually assaulted, by Uber Driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and psychological harm from which she may never fully recover.

232.    As a legal result of Uber's aforementioned acts and omissions, Plaintiff suffered damages, both economic and general, non-economic damages according to proof.

## PUNITIVE DAMAGES

233.     Plaintiff hereby incorporates by reference the preceding paragraphs, causes of action, and factual allegations.

234.     As stated above, Uber was aware that it faced an ongoing sexual violence epidemic and that its drivers were sexually victimizing its passengers. As early as May 2013, Uber knew that its drivers were committing acts of sexual assault and misconduct against Uber's female passengers. Since as early as May 2013, Uber has frequently received passenger complaints about sexual violence committed by Uber's drivers against Uber's passengers, , it has been notified of law enforcement investigations of the criminal sexual conduct of drivers acting within their capacity as Uber drivers, and it has been the subject of numerous civil suits alleging the sexual violence of Uber's passengers by Uber's drivers.

235.     Nevertheless, even though Uber was fully aware of its sexual predator problem, it failed to take adequate safety precautions to protect its passengers. Even after Uber was aware that some Uber drivers used Uber as an opportunity to get unsuspecting women into their vehicle and commit acts of sexual violence, Uber and its executive officers made the conscious decision not to more thoroughly vet its drivers before and after hiring them.

236.     The decision not to implement more thorough and persistent background checks was driven by the desire of Uber executives for rapid expansion and increased profits, because the more drivers driving for Uber, the more money there was to be made.

237.     Prioritizing profits over safety, Uber and its executive officers also made the conscious decision not to warn its customers and users of the risk of sexual violence, even after they were fully aware of this risk.

238.     Safety precautions such as enhanced background checks, biometric fingerprinting, job interviews, electronic monitoring systems, ongoing monitoring of Uber drivers and rides through available

48

technology including cameras and GPS; an option for female passengers to choose to ride with a female driver; a zero-tolerance policy for drivers who deviate from expected behavior by leaving the vehicle with passengers, or by deviating substantially from the assigned route, a warning system for when a driver significantly deviates from the intended route or prematurely terminates a ride, a system for checking in with and verifying a passenger's safety when a driver prematurely terminates a ride or significantly deviates from the intended route; a zero-tolerance program for sexual violence and guidelines mandating immediate termination; a zero-tolerance policy for fraternizing with passengers, creating and instituting a system encouraging customer reporting; and adequate monitoring of customer complaints by well-trained and effective customer service representatives, warnings to passengers of the dangers of being attacked by Uber drivers, and cooperation with law enforcement when a driver attacks a passenger would have cost Uber money and reputational damage. Because of this, Uber, at the direction of its corporate officers, decided not to implement such precautions and instead has continued to place its passengers at greater risk of sexual violence by Uber's drivers.

239.    Prioritizing profits over passenger safety, Uber and its executive officers acted, and continue to act, recklessly and in knowing, conscious disregard of the safety of its passengers, including Plaintiff, and the public.

240.    As a legal result of the Uber's negligent, reckless and grossly negligent conduct of Uber, Plaintiff was sexually assaulted, by Uber Driver, which humiliated, degraded, violated, and robbed her of her dignity and personal safety.

241.    The depraved attack on Plaintiff caused Plaintiff to suffer serious emotional distress as well as physical and psychological harm from which she may never fully recover.

242.    Uber's negligence and recklessness was a "willful and conscious disregard" of the safety of others, and therefore warrants punitive damages pursuant to California Civil Code § 3294.

243.    As a result of Uber's above-stated misconduct, Plaintiff prays for exemplary damages to punish Uber for its misconduct and to deter future misconduct.

## **PRAYER FOR RELIEF**

244.    Plaintiff prays for judgment against all Defendants joint and severally as follows:

a.   For special damages, according to proof;

b.   For past and future general damages, including physical pain, mental anguish, disfigurement and physical impairment, according to proof;

c.   For past and future lost earnings or earning capacity, according to proof;

d.   For medical expenses, past and future, according to proof;

e.   For punitive and exemplary damages, according to proof;

f.   For pre-judgment interest from the date of Plaintiff's incident to the date of judgment, as provided by law, according to proof at the time of trial;

g.   For costs of litigation incurred herein;

h.   For attorneys' fees;

i.   For such other and further relief as this Court may deem just and proper.

## **DEMAND FOR A JURY TRIAL**

245.    Plaintiff demands a trial by a jury on all triable issues.

Dated: August 7, 2023                    Respectfully submitted,

                                **WILLIAMS HART & BOUNDAS, LLP**

                         By:  */s/ Walt Cubberly*
                                Walt Cubberly
                                *Attorney for Plaintiff*

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL